1   **BONNETT, FAIRBOURN,**
      **FRIEDMAN & BALINT, P.C.**
2   TODD D. CARPENTER (CA 234464)
    600 West Broadway, Suite 900
3   San Diego, CA 92101
    Telephone:    (619) 756-6978
4   Facsimile:    (602) 274-1199

5   **BONNETT, FAIRBOURN,**
      **FRIEDMAN & BALINT, P.C.**
6   ANDREW S. FRIEDMAN (AZ 005425)
    ELAINE A. RYAN (AZ 012870)
7   PATRICIA N. SYVERSON (CA 203111; AZ 020191)
    2901 N. Central Avenue, Suite 1000
8   Phoenix, AZ  85012-3311
    Telephone:    (602) 776-5925
9   Facsimile:    (602) 274-1199

10  **PISCITELLI LAW FIRM**
    Frank E. Piscitelli, Jr.
11  55 Public Square, Suite 1950
    Cleveland, Ohio 44113
12  Telephone: (216) 931-7000

13  *Attorneys for Plaintiffs*

14                         UNITED STATES DISTRICT COURT

15                     FOR THE SOUTHERN DISTRICT OF CALIFORNIA

16

17  DAVID JOHNS, an Individual, and MARC         Case No. 09 CV 1935 AJB POR
    BORDMAN, an Individual, on Behalf of
18  Themselves, All Others Similarly Situated,
    and the General Public,
19                                               **[REDACTED] PLAINTIFFS'**
                          Plaintiffs,            **MEMORANDUM OF POINTS AND**
20                    v.                          **AUTHORITIES IN SUPPORT OF**
                                                 **PLAINTIFFS' MOTION FOR CLASS**
21  BAYER CORPORATION, an Indiana                **CERTIFICATION**
    corporation and BAYER HEALTHCARE,
22  LLC, a Delaware limited liability company,
                                                 Date:  January 13, 2012
23                        Defendants.            Time:  1:30 p.m.
                                                 Judge:  Hon. Anthony J. Battaglia
24                                               Courtroom:  12

25

26

27

28

1

**TABLE OF CONTENTS**

2
PAGE

3  I.   INTRODUCTION ..................................................................... 1

4  II.  PLAINTIFFS WILL USE CLASS-WIDE EVIDENCE TO PROVE
     THEIR CLAIMS........................................................................ 5

5
6      A. Bayer Sought to Boost Sales by Claiming Prostate Health Benefits ................... 5

7      B. Bayer's Uniform Marketing Message.................................................... 6

8          1.    The Prostate Claim Was Emphasized On Men's Vitamins
                 Packages............................................................................. 7

9
10         2.    The Prostate Claim Was Emphasized In Media Advertising..................... 8

11         3.    The Prostate Claim Resonated With Consumers. ........................ 9

12     C. Bayer Lacked Scientific Substantiation for its Prostate Health Claim ............... 10

13 III. PLAINTIFFS SEEK TO CERTIFY UCL AND CLRA CLAIMS ............................. 13

14         A.    UCL.................................................................................... 13
           B.    CLRA.................................................................................. 14

15 IV.  THIS CASE SATISFIES THE REQUIREMENTS OF RULE 23................................. 15

16     A. Plaintiffs Satisfy the Rule 23(a) Prerequisites ...................................... 15

17         1.    Numerosity............................................................................ 15
18         2.    Commonality........................................................................... 16
           3.    Typicality ............................................................................. 16
19         4.    Adequacy of Representation .................................................... 17

20     B. Rule 23(b)(3) Is Satisfied.............................................................. 18

21         1.    Predominance is Satisfied ....................................................... 19

22               a.  Common Issues Predominate ............................................. 19

23               b. Determination of Relief Does Not Defeat Predominance................... 22

24               c. A Class Action Is Superior to Other Available Methods of
                    Adjudicating the Issues Raised ........................................... 24

25
26 V.   CONCLUSION.......................................................................... 25
27

28

1

## <u>TABLE OF AUTHORITIES</u>

2

<u>PAGE</u>

**CASES**

3

*Amchem Prods. v. Windsor*
 521 U.S. 591 (1997)......................................................................................15, 18, 19

4

5

*Blackie v. Barack*
 524 F.2d 891 (9th Cir. 1975) ........................................................................22

6

*Bogosian v. Gulf Oil Corp.*
 561 F.2d 434 (3d Cir. 1977)..........................................................................22

7

8

*Broberg v. Guardian Life Ins. Co. of Am.*
 171 Cal. App. 4th 912 (Ct. App. 2009)..........................................................5

9

10

*California v. Levi Strauss & Co.*
 41 Cal.3d 460 (1986) .....................................................................................15

11

*Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*
 20 Cal.4th 163 (1999) ..............................................................................13, 23

12

13

*Charlebois v. Angels Baseball, LP*
 2011 WL 2610122 (C.D. Cal. June 30, 2011) ............................................16

14

15

*Churchhill Village, L.L.C.*
 169 F.Supp.2d 1119 (N.D. Cal. 2010) .........................................................16

16

17

*Colgan v. Leatherman Tool Group, Inc.*
 38 Cal.Rptr.3d 36 (Cal. Ct. App. 2006) .......................................................23

18

*Consumers Union of U.S., Inc. v. Alta-Dena Certified Dairy*
 4 Cal.App.4th 963, 975 (1992) .....................................................................13

19

20

*Cortez v. Purolator Air Filtration Prods. Co.*
 23 Cal.4th 163 (2000) ...................................................................................13

21

22

*Daar v. Yellow Cab Co.*
 67 Cal.2d 695 (1967) ....................................................................................15

23

24

*Deposit Guar. Nat'l Bank v. Roper*
 445 U.S. 326 (1980)......................................................................................24

25

*Dukes v. Wal Mart Stores, Inc.*
 603 F.3d 571 (9th Cir. 2010) ........................................................................17

26

27

*Eisen v. Carlisle & Jacquelin*
 417 U.S. 156 (1974)......................................................................................15

28

*Ewert v. eBay, Inc.*
    2010 WL 4269259 (N.D. Cal. Oct. 25, 2010).......................................14

*FTC v. Figgie Int'l*
    994 F.2d 595 (9th Cir. 1993) .......................................23

*Gartin v. S & M Nutec, LLC*
    245 F.R.D. 429 (C.D. Cal. 2007) .......................................19

*Gold Strike Stamp Co. v. Christensen*
    436 F.2d 791 (10th Cir. 1970) .......................................22

*Hanlon v. Chrysler Corp.*
    150 F.3d 1011 (9th Cir. 1998) .......................................16, 17, 18, 19, 24

*Hanon v. Dataproducts Corp.*
    976 F.2d 497 (9th Cir. 1992) .......................................16, 17
7
*Heighley v. J.C. Penney Life Ins. Co.*
    257 F. Supp. 2d 1241 (C.D. Cal. 2003) .......................................14

*Hilao v. Estate of Marcos*
    103 F.3d 767 (9th Cir. 1996) .......................................23

*In re First Alliance Mortg. Co.*
    471 F.3d 977 (9th Cir. 2006) .......................................15, 16

*In re Tobacco II Cases*
    46 Cal.4th 298 (2009) .......................................13,14, 20

*In re Visa Check/MasterMoney Antitrust Litig.*
    280 F.3d 124 (2d Cir. 2001).......................................19, 22

*Keilholtz v. Lennox Health Prods., Inc.*
    268 F.R.D. 330 (N.D. Cal. 2010).......................................17

*Keilholtz v. Lennox Hearth Prods. Inc.*
    No. C 08-00836 CW, 2009 WL 2905960 (N.D. Cal. Sept. 8, 2009).......................5

*Kraus v. Trinity Management Services, Inc.*
    23 Cal. 4th 116 (2000) .......................................24

*Kwikset Corp. v. Superior Court*
    51 Cal. 4th 310 (2011) .......................................21

*Lavie v. Procter & Gamble Co.*
    105 Cal.App.4th 496 (2003) .......................................14

*Local Joint Exec. Bd. of Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc.*
    244 F.3d 1152 (9th Cir. 2001) ............................................................................... 18

*Martinez v. The Welk Group, Inc.*
    2011 WL 2173764 (S.D. Cal. June 2, 2011)...........................................................21

*McKell v. Washington Mut., Inc.*
    142 Cal.App.4th 1457 (2006) ....................................................................... 13, 14

*Molski v. Gleich*
    318 F.3d 937 (9th Cir. 2003) ................................................................................ 17

*Nelson v. Mead Johnson*
    270 F.R.D. 689 (S.D. Fla. 2010) .............................................................................4

*Norwest Mortgage, Inc. v. Superior Court*
    72 Cal.App.4th 214 (1999) ................................................................................... 16

*Paduano v. American Honda Motor Co., Inc.*
    169 Cal.App.4th 1453 (2009) ............................................................................... 15

*People v. Casa Blanca Convalescent Homes, Inc.*
    159 Cal. App. 3d 509 (1984) ................................................................................ 14

*Saunders v. Superior Court*
    27 Cal.App.4th 832 (1994) ........................................................................... 13, 14

*Schnall v. Hertz Corp.*
    78 Cal.App.4th 1144 (2000) ................................................................................. 14

*Smilow v. SW Bell Mobile Sys., Inc.*
    323 F.3d 32 (1st Cir. 2003)....................................................................................22

*State Farm Fire & Cas. Co. v. Superior Court*
    45 Cal.App.4th 1093 (1996) ................................................................................. 14

*Staton v. Boeing Co.*
    327 F.3d 938 (9th Cir. 2003) .......................................................................... 15, 17

*True v. American Honda Motor Co., Inc.*
    520 F.Supp.2d 1175 (C.D. Cal. 2007) ..................................................................21

*Valentino v. Carter-Wallace, Inc.*
    97 F.3d 1227 (9th Cir. 1996) ................................................................................24

*Vasquez v. Superior Court*
    4 Cal.3d 800 (1971) .......................................................................... 14, 15, 21, 24

*Wiener v. Dannon Co., Inc*.
    255 F.R.D. 658 (C.D. Cal. 2009) ..................................................................*passim*

*Williams v. Gerber Food Prods. Co*.
    552 F.3d 934 (9th Cir. 2008) ...................................................................... 14, 19

*Yokayama v. Midland National Life Ins. Co*.
    594 F.3d 1087 (9th Cir. 2010) ............................................................................ 20

*Yumul v. Smart Balance, Inc*.
    733 F. Supp. 2d 1134 (C.D. Cal. 2010) .............................................................. 5

*Zinser v. Accufix Research Inst., Inc*.
    253 F.3d 1180 (9th Cir. 2001) ............................................................................ 24

**OTHER AUTHORITIES**

6 A. Conte & H. Newberg, *Newberg on Class Actions* (4th ed. 2002)............. 16, 22, 23, 24
Cal. Bus. & Prof. Code §17200 ........................................................................... 1, 14
Cal. Bus. & Prof. Code §17203 ......................................................................... 14, 15
Cal. Bus. & Prof. Code §17204 ............................................................................... 24
Cal. Civ. Code §1770 ............................................................................................... 15
Consumers Legal Remedies Act Civil Code §1750 ................................................... 1

**RULES**

Fed. R. Civ. P. 23(a) ........................................................................... 15, 16, 17, 18, 19

1       Plaintiffs David Johns and Marc Bordman respectfully submit this memorandum in support of

2   their motion to certify a California Class for the Unfair Competition Law ("UCL"), Business and

3   Professions Code §17200, e*t seq.*, and the Consumers Legal Remedies Act ("CLRA"), Civil Code

4   §1750, e*t seq.*, causes of action alleged in their Second Amended Class Action Complaint

5   ("Complaint") against Bayer Corporation and Bayer Healthcare, LLC (collectively "Bayer" or

6   "Defendants").

7   **I.      INTRODUCTION**

8       Bayer sells the popular "One A Day" ("OAD") line of multivitamins.  Bayer markets its OAD

9   multivitamins as a multivitamin ***plus*** some nutritional attribute not generally found in other

10  multivitamins, making OAD the superior choice for consumers interested in the additional attribute.

11  Ex. 1[1] (JOHNSBAY-0000034)("████████████████████").  Plaintiffs challenge the

12  promise Bayer made about its One A Day Men's Health Formula and One A Day Men's 50+

13  Advantage vitamins ("Men's Vitamins").  On the front, back and sides of the Men's Vitamins'

14  packages and in its advertising, Bayer promised that taking Men's Vitamins daily would "support

15  prostate health," including reducing the risk of developing prostate cancer. For this promised material

16  benefit, Bayer charged a price premium over other multivitamins.  In truth, Men's Vitamins did not

17  provide any prostate health benefits.  In fact, recent clinical studies have shown that for some men,

18  increased selenium consumption may increase their prostate cancer risk.

19      Bayer's decision to market its Men's Vitamins by focusing on the prostate health claim was a

20  direct result of its market research into what would sell; not a decision based on a competent and

21  reliable scientifically supported benefit to the consumer.  Bayer's market research indicated that

22  consumers believed prostate health was important and they would purchase vitamins that claimed to

23  support prostate health.  Only after Bayer's marketing department determined it was going to make

24  the prostate claim to increase sales, was Bayer's science department brought into the process.

25  Understanding the "strategic importance for the brand to maintain the prostate health claim," (Ex. 2,

26  _____

27  [1] All references to "Ex" and "Exs." are to the Declaration of Patricia N. Syverson in Support of

28  Plaintiffs' Motion for Class Certification, filed concurrently ("Syverson Declaration").

1   Patel, 70:9-19), the science department was tasked with "███████████," *i.e.*, "██████

2   ██████████████████████████████." Patel 24:3-17, 70:9-19.[2]  Bayer asserted that its

3   Men's Vitamins provided the prostate health benefits because they contained the antioxidant

4   "lycopene," and later, the trace mineral "selenium." Bayer first marketed the vitamins as containing

5   lycopene because it found through its market research that consumers associated lycopene with

6   prostate health. It started emphasizing selenium when its market research showed that touting

7   selenium would better convey its prostate health promise.

8          Despite the promise of improved prostate health, throughout the Class Period defined below,

9   Bayer never had credible and reliable scientific support for the promise. In fact, some of the studies

10  Bayer relied on involved consuming lycopene in pizza and other tomato based products, or involved a

11  more absorbable form of selenium from the sodium selenite contained in the Men's Vitamins.

12  Bayer's internal documents establish that Bayer was aware of these material differences and that

13  Bayer knew that the studies it was relying on did not include "████████████████████████

14  ███████"[3]  In relying on this junk science to substantiate its prostate claims, Bayer deviated from its

15  own "Nutritional Science: Plan of Principles" which requires substantiating evidence to conform to

16  FTC criteria.  Ex. 4, BAYER-0125704.  Further, numerous studies, governmental reports, and

17  Bayer's own internal documents concluded that lycopene and selenium did not deliver the promised

18  prostate benefits.  An email from the Prostate Cancer Foundation warned Bayer that, "█████████

19  ███████████████████████████████████████████████████████████

20  ██████████████████" Ex. 5, JOHNSBAY-0087220.  And, with respect to lycopene, the FDA

21  determined that "████████████████████████████████████████████████

22  ████████████████████████████████████████████████████████

23  ████████████████," including prostate cancer. Ex. 6 (FDA response, Qualified Health

24  ──────────────────────────────

25  [2] *See also* BAYER0125707 ("Often [the science department] receive[s] a 'wish list' of claims from our marketing partners and must then match the available science to this list.").

26  [3] *See Ashton, et al.* Ex. 3, at JOHNSBAY-0115107 ("████████████████████████████

27  ██████████████████████████████████████████████████████

28  ████████") (emphasis added).

1    Claims, dated Nov. 8, 2005) at JOHNSBAY-002005.

2         In 2009, three major events occurred confirming prior research: (1) the FDA reported "it is

3    highly unlikely that selenium supplements reduce the risk of prostate cancer;" (2) after seven years, a

4    large study funded by the National Institutes of Health known as the Selenium and Vitamin E Cancer

5    Prevention Trial ("SELECT") (the only randomized controlled trial investigating whether selenium

6    prevents prostate cancer) was halted after no prostate cancer benefit was detected, and the selenium

7    supplements may have been *increasing* the risk of diabetes; and (3) a study funded by the prestigious

8    Dana-Farber Cancer Institute found that men with high selenium levels in their blood faced an

9    increasing risk of aggressive cancer and "caution[ed] against broad use of selenium supplementation

10   for men with prostate cancer."

11        After these three events, Bayer was forced to quietly stop making the prostate health claim,

12   but not before it had " ███████████████████████████████████████████

13   ██████████████████████. Ex. 7, Nunziata, 130:12-131:9; *see also* Nunziata, 131:2-132:12

14   (██████████████████████████████). While Bayer continued to sell the Men's

15   Vitamins with the offending labels, Bayer's Vice President of Global Communications "████████

16   ████████████████████████████████████." Ex. 8, (JOHNSBAY-

17   0215480)(email dated June 26, 2009).

18        Although Bayer tried to conceal its lack of substantiation for the prostate health claim, by the

19   beginning of 2010, the Attorneys General of California, Illinois and Oregon had begun an

20   investigation of Bayer's prostate health claims – the same claims at issue in this case.  After engaging

21   in extensive discovery and having many of its employees interviewed by the AGs, in October 2010,

22   Bayer entered into a Settlement Agreement with the AGs.  As part of the settlement, Bayer agreed

23   only to make representations that are "non-misleading, and, at the time the representation is made,

24   Bayer [must] possess[] and rel[y] upon Competent and Reliable Scientific Evidence."  Stipulated

25   General Judgment, Section VI (Ex. 9).  Further, Bayer agreed to pay $3.3 million to the AGs' offices,

26   collectively.  *Id.* at Section VI.

27        However, the issue presented by this Motion is not whether Bayer's prostate health message

28   was in fact substantiated or true, but whether Plaintiffs can present their case on a class-wide basis.

1   Given the uniform facts and claims in this litigation, Plaintiffs can do so.  Throughout the Class

2   period, both Men's Vitamins contained identical amounts of lycopene and selenium.  Both Men's

3   Vitamins also came in packages that promised the multivitamins would "support prostate health"

4   throughout the Class period.  Thus, whether the universally conveyed prostate health message is false

5   or deceptive is a common question for every Class member that can be analyzed on a class-wide

6   basis, just as Bayer purported to do when it offered "scientific" studies as substantiation for its

7   advertised claims.  Indeed, this action is similar to a series of recent product false advertising class

8   actions alleging analogous facts and legal theories in which federal courts in California and Florida

9   have found that the prerequisites for class certification were met.  *See Wiener v. Dannon Co., Inc.*,

10  255 F.R.D. 658 (C.D. Cal. 2009) (alleging defendant falsely represents that its premium-priced yogurt

11  has digestive health benefits no other yogurt has); *see also Johnson v. Gen.  Mills, Inc.*, --- F.R.D. ----,

12  2011 WL 1514702 (C.D. Cal. April 20, 2011) (same); *Fitzpatrick v. Gen. Mills, Inc.*, 263 F.R.D. 687

13  (S.D. Fla. 2010) *vacated*, 635 F.3d 1279 (11th Cir. 2011) (on remand, circuit court suggested a

14  broader class definition) (same); *Nelson v. Mead Johnson*, 270 F.R.D. 689 (S.D. Fla. 2010) (alleging

15  that defendant falsely represents that its premium-priced baby formula is the only formula that

16  contains DHA and ARA ingredients).  Plaintiffs will present expert testimony, the existing scientific

17  studies (including the 15 studies Bayer relied on in making its prostate claims), and FDA reports to

18  establish that the purported active ingredients, lycopene and selenium, do not do what Bayer

19  promised they would do. This is a question of science, which by its very nature is susceptible to class-

20  wide evidence.

21          The class Plaintiffs seek to have certified is defined as all persons who purchased the Men's

22  Vitamins in the State of California, from the date the Men's Vitamins were first sold in California

23  with "prostate health" claims[4] to May 31, 2010.[5]

24

25  _____

26  [4] The Class period should go back to the original date the products were sold with the "prostate health claims."  The One A Day Men's Health Formula product was re-branded/formulated for prostate health claims in March 2002 and the One A Day Men's 50+ Advantage product was re-branded with prostate health claims in April 2007.  Nicholson Decl., at ¶¶ 12-13 (*Godec v. Bayer*, Dkt. No. 91-3).

27

28

## II.   PLAINTIFFS WILL USE CLASS-WIDE EVIDENCE TO PROVE THEIR CLAIMS

### A.   Bayer Sought to Boost Sales by Claiming Prostate Health Benefits

In 2001, Bayer launched an OAD sub-brand with a "focused added-value benefit" because the OAD brand was not "widely perceived (by consumers) as modern, scientifically advanced or leading edge." Ex. 11 (BAYER-0066050)(OAD Men's Concept Exploratory Report dated Oct. 2001) at 1, 4. Bayer learned through its market research that prostate health, including prostate cancer, was "foremost among men's health concerns." *Id.* at 5.  The market research taught Bayer that, "an emphasis on prostate may be the strongest direction" because prostate cancer was considered "[a] critical concern [consumers] feel defenseless against." *Id.* at 5-6.  Having "███████████████ ███████████████████████," the marketing department went to the science department "██ ████████████████████████████" Patel, 40:3-11.

Until 2007, Bayer marketed lycopene as the ingredient that supposedly supported prostate health because its market research showed consumers had begun to associate lycopene with prostate health.   In 2007, Bayer's on-going market research revealed that many consumers associated selenium, an ingredient touted by Bayer's primary competitor, with prostate health. Ex. 12 (FRC report dated June 2008) at JOHNSBAY-0000862-863.  According to Bayer's market research, the "███████████" prostate "██████████," or "████,"[6] is "██████████████████████████████████████████████████████" *Id.* at JOHNSBAY-0000866, and 905 ("████████████████████████████████████████████████████████████

Here, because Bayer was "in a far superior position to know of the act and the injury, and the act and the injury are difficult for the plaintiff to detect," *Keilholtz v. Lennox Hearth Prods. Inc.*, No. C 08-00836 CW, 2009 WL 2905960, at *3 (N.D. Cal. Sept. 8, 2009), it is appropriate for the Court to invoke the discovery rule and permit the Class period to go back to the original date the products were sold – rather than being strictly limited to the statute of limitations.  *See Yumul v. Smart Balance, Inc.*, 733 F. Supp. 2d 1134, 1141, 1143 (C.D. Cal. 2010) (applying discovery rule analysis to CLRA claim); *Broberg v. Guardian Life Ins. Co. of Am.*, 171 Cal. App. 4th 912, 9210-21 (Ct. App. 2009) (applying discovery rule to UCL claim).
[5]   The OAD products with the prostate claims remained on retailers' shelves for purchase by consumers until May 2010. Ex. 10 (Oregon AG Complaint).
[6]   According to Bayer, the marketing concept "██████████████████" is critical to successful marketing: "██████████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████." Ex. 13, Kolpon at 164:3-12.

1  ██████████████████████████████████████████████").[7] Based on this market research, Bayer

2  started emphasizing that selenium also provided its Men's Vitamins with the promised prostate health

3  benefits.[8] Ex. 16 (BAYER-0000130-266) (OAD packages and labels), (OAD print ads, "free standing

4  inserts," coupons and brochures), (radio ad scripts), (OAD website).   Bayer prominently placed the

5  selenium claims on the top, back, and side panels of packaging for its Men's Vitamins. Kolpon at

6  31:16-33:17; *id.* at 36:3-20.

7        In 2009, Bayer started using the tagline "██████████████████████████████

8  ████████" for its Men's Vitamins. *See* Ex. 17 (JOHNSBAY-0124246)(OAD Key Messages, Draft

9  5.30.07) (██████████████████████████████████████████████████████████████████

10 ██████████████████████████████████████████████████████████████████████████

11 ██████████████████████████). The decision to increase the amount of selenium in the Men's Vitamins

12 "███████████████████████████████" so Bayer could "██████████████████████████

13 ████████████████████" Ex. 18, Hendley at 15:13-16:4; Nunziata at 21:21-22:9 ████████████

14 ██████████████████████████████████████████████████████████████████████████

15 ████████████████████████████████████████).   Bayer lacked any substantiation for

16 the implied claim that more selenium resulted in an increased benefit to men.   Patel, 78:9-15.

17     **B.**    **Bayer's Uniform Marketing Message**

18       According to Bayer, the "████████," "████████████," and "██████████████" for

19 OAD Men's is "██████████████████████████," "████████," and "██████████████████

20 ████████" and for OAD Men's 50+ is "██████████████████████████████████████,"

21 "████████████████," and "██████████████████████████████████." Ex. 19 (JOHNSBAY-

22 0000118)(document entitled "████████████████████").   Supporting and addressing the prostate health

23 _____

24 [7] *See also* Ex. 14 (December 2008 email attaching 2005 Men's Strategy test results) at JOHNSBAY-

25 0001303 (the stronger purchase intent "PI" market research results "████████████████████████████
    ████████████████████████████████); Ex. 15, Studness, 45:20-25 (it was important to use

26 the selenium prostate claim because it █████████████████████████████████████").
[8] From 2002 to 2009, OAD Men's and Men's 50+ both contained the same amount of sodium

27 selenium and lycopene (*i.e.*, 105 µg selenium as sodium selenium and 600 µg lycopene).   *See*
Declaration of Jeffrey Blumberg, at 5 (*Godec v. Bayer*, Dkt. # 91-4).   Thus, the necessary

28 substantiation for the selenium in the two products would not have differed.   Hendley, 36:10-14.

1  issue was the "███████████████" for the Men's Vitamins. Ex. 20 (OAD Campaign

2  Progression Meeting Feb. 20, 2008) at JOHNSBAY-0124879. The "██████████" for OAD

3  Men's in 2005 was to ████████████████████████████████████████

4  ██████████████████████████████████████████████████████ Ex. 21

5  (JOHNSBAY-0022546)(OAD Men's Health TV Poolout Creative Brief 1/11/5).

6  Tracy Nunziata, former Brand Director for the Men's Vitamins, stated that "███████

7  ████████████████████████████" Nunziata at 17:12-24, 19:3-10 ("███████

8  ████████████████████████████████████████████████████████

9  ████████████████████████████"), 19:21-20:4 ("███████████████

10 ████████████████████████████████████████████████████████

11 ████████████████████████████████████████████████████████

12 ████████████████") (emphasis added), 15:25-16:25 (same), 11:22-13:15 (same).  Thus,

13 although Bayer's "prostate health" marketing message was brought to consumers through various

14 media – such as print, TV, internet (as described more fully below) – all the media worked "███

15 ████████████████████" to "████████████████████" of prostate health. Nunziata, 43:5-23.

16 Different media provided Bayer "████████████████████████████."

17 Nunziata, 44:13-16.

18 **1.    The Prostate Claim Was Emphasized on Men's Vitamins Packages.**

19 Consistent with its media advertisements, all of the Men's Vitamins' packages prominently

20 call out prostate health benefits:

Bayer reinforces the misleading prostate claim on the back of the Products' packaging. Appearing in highlighted, bolded and italicized print on the OAD Men's package, Bayer makes the prostate claim stating: **"Complete Multivitamin Plus More† for Men - Did you know that prostate cancer is the most frequently diagnosed cancer in men and that emerging research suggests may reduce the risk of prostate cancer?   One A Day® Men's Health Formula is a complete multivitamin plus key nutrients including Selenium to support a healthy prostate."** Ex. 22 (Johns Depo. Ex. 8).   Bayer makes the substantially similar prostate claim on its OAD 50+ Advantage package where it states that the product is a **"Multivitamin Specifically Formulated for Men Over 50…One A Day® Men's 50+ Advantage contains Lycopene and five time the Selenium of Centrum® Silver® to support prostate health…."** Ex. 23 (Bordman Depo. Ex. 5).

### 2.    The Prostate Claim Was Emphasized In Media Advertising.

Bayer's marketing campaigns claim that Men's Vitamins are "████████████████" plus OAD Men's has "███████████████████████" and that OAD Men's 50+ is "████████████" and contains "██████████████████████████" to support prostate health. Ex. 19, JOHNSBAY-0000118; *see also* Ex. 24, JOHNSBAY-0000006.   A typical OAD Men's television commercial, called "████████████," states:

████████████████████████████████████████████ (██████
████████████████████)
████████████████████████████████████████
████████████████████████████████████████████████████
█

Ex. 25 (Men's Vitamins' TV and Radio Ads) at JOHNSBAY-0124367 at p. 19. Television commercials with the same prostate health message aired regularly throughout California throughout the Class period. Ex. 26 (JOHNSBAY-158594)(2007 television ad timeline).

Bayer also partnered with Major League Baseball in what Bayer called its "████████████

1  ██████" campaign. *See, e.g.*, Ex. 27 (JOHNSBAY-0000305)(MLB/OAD print advertisement); Ex. 28

2  (JOHNSBAY-0124981)(MLB/OAD radio script).  According to Bayer's documents, "███████████

3  ████████████████████████████████████████████████████████████████████

4  ████████████████████████████████████████" Ex. 29 (████████████████████████

5  █████████████████) at JOHNSBAY-0124299. Bayer testified that its MLB partnership has

6  been a "███████████████" in "██████████████████████████" market. Kolpon at 162:3

7  –163:15; *see also* Nunziata at 45:14-22 ("██████████████████████████████████████

8  ████████████████████████████████████████████████████████████████████

9  ████████████████████████████████████████████████████████████").[9]

### 3.    The Prostate Claim Resonated With Consumers.

11  Before, during and after spending millions of dollars on this advertising campaign, Bayer

12  conducted extensive market research to ensure its intended message was communicated to potential

13  purchasers because "███████████████████████████████." Kolpon at 94:22-96:19,

14  Nunziata at 64:23-65:16 (███████████████████████████████████████████).

15  Quantitative market research conducted by ACNielsen in June 2002 informed Bayer that pursuing a

16  "█████████████" would far exceed Bayer's OAD Men's Health restaging goal. Ex. 31 (ACNielsen

17  report dated June 2002) at JOHNSBAY-0000408 ████████████████████████████████████

18  █████████████), and 411 ████████████████████████████████████████████

19  █████████████████████) (emphasis added). Bayer confirmed in a March 2004 market research

20  survey that several of its television commercials were effective advertising vehicles to ████████████

21  ████████████████████████████████████████████████████████████████████

22  ███████████████████ Ex. 32 (Ipsos-ASI report dated March 2004) at JOHNSBAY-0000472, and

23  488 (██████████████████████████████████████).

24  Bayer's market research about Men's 50+ multivitamins also confirmed that the predominant

25

<hr />

26  [9] Bayer also advertised the Men's Vitamins with references to the cancer foundation of famous cancer

27  survivor Lance Armstrong. Ex. 30 (JOHNSBAY-0000252-53)(package stating "████████████████████" "███████████████████████" and "█████████

28  ██████████").

1  prostate health message present in OAD Men's advertising should and was being conveyed in Men's

2  50+ advertising. For example, each of the "█████████████" or "█████" called out in OAD Men's

3  50+ linked the product's ingredient to prostate health. Ex. 33 (████████████████████████

4  ████████████) at JOHNSBAY- 0000608, 610-611, 620 (each concept included prostate health

5  messaging). In fact, "████████████████████████████████████████████████████████

6  ████████████████" *Id.* at JOHNSBAY- 0000633.[10]  Subsequent Men's 50+ market research

7  confirms that the prostate messaging goal was ████████████████████████████████████

8  ████████ Ex. 36 (Ameritest report dated April 2007) at JOHNSBAY-0000716-17, 730-31.

9       Even when Bayer sought to reposition its Men's Vitamins in 2008 by including secondary

10  benefits, the "█████████████████████████████████████████████████." Ex. 12 (FRC report

11  dated June 2008) at JOHNSBAY-0000852.  Whether Bayer's advertising directly addressed "████

12  ████████" or "███████████," the advertisements were appealing to consumers. *Id.* at 0000866.

13       **C.      Bayer Lacked Scientific Substantiation for its Prostate Health Claim**

14       Bayer never had clinical proof substantiating its prostate health claim. The scientific proof

15  necessary to substantiate Bayer's claim must start with independent, double-blinded, placebo-

16  controlled, properly randomized clinical trials conducted ***after*** in-vitro or animal studies performed to

17  ensure the safety of the tested product or ingredient on a human (clinical) population. Moreover, the

18  clinical studies must test a valid, relevant endpoint (*e.g.*, to substantiate claims of prostate health, an

19  endpoint testing duration of common cold is irrelevant), and the degree of the results must be

20  scientifically significant. Bayer's science and medical research personnel agree,[11] as these standards

21  are incorporated in Bayer's "Nutritional Science: Plan of Principles" which "cover medical claims of

22  _____

23  [10]  *See also* Ex. 34 at JOHNSBAY-0053433 (the RTB for Men's 50+ is "█████████████████
    ████████████████████████████████████████████████████████████████████████");
24  Ex. 35 (OAD Project Focus report dated June 2006) at JOHNSBAY-0146654 (the RTB for Men's
    50+ will be "████████████████████████████").
25  [11]  *See* Ex. 38, Beke, at 74:22-76:18 ("█████████████████
    █████████████████████████████████████████████████████████████████████████████
26  ███████████████████████████████████████"), Patel, at 141:22-142:5 (███████████
    ██████████████████████████████████); Declaration of Jeffrey Blumberg, at 7-8 (Bayer's
27  science expert in *Godec*, Dkt # 91-4) ("claims regarding the functional and health benefits of
    nutritional supplements are not appropriately drawn directly from *in vitro* experiments and animal
28  models").

1  safety and efficacy and how those claims are substantiated."  BAYER-0125705.  Yet, the studies

2  Bayer relied on do not meet these standards.

3        Bayer continues to maintain that a body of "competent and reliable scientific evidence"

4  substantiates its claim that Selenium supports prostate health, including reducing the risk of prostate

5  cancer. Ex. 39 (Bayer's response to Interrogatory No. 1, identifying 12 studies).  None of these

6  studies are scientifically sound.  And, the "█████████████████████████████████████████

7  ████████████████████████████████████" upon which Bayer relies did not even test the

8  form of selenium (i.e., sodium selenite) in the Men's Vitamins.[12] Patel, 89:17-90:19 (Duffield-Lillico

9  study).  In January 2008, when Bayer's Brand Manager responded to a request for substantiation of

10 the prostate claims, she simply attached Bayer's "POV" or point-of-view on Selenium,[13] which did

11 not substantiate its claims and had not been updated since 2005.  See Ex. 41, JOHNSBAY-0001794

12 (Men's Substantiation email dated Jan. 24, 2008, attaching Bayer's "POV" or point-of-view on

13 Selenium).[14] In February 2011, after the AG Settlement and after Bayer stopped making the prostate

14 health claim, Bayer drafted a memo whose subject was "███████████████████████████████

15 ███████" wherein Bayer still struggles to substantiate its prostate claim so that it may have the

16 "Competent and Reliance Scientific Evidence" necessary to comply with the terms of the Stipulated

17 Judgment it entered into with the AGs and continue making its lucrative prostate health claims.

18       Bayer also had no substantiation for its claim that lycopene supports prostate health.  After

19 reviewing 177 publications, including the studies Bayer relies upon,[15] the FDA concluded that "█

20 _____

21 [12] Bayer was aware that the form of selenium in the Duffield-Lillico study was the organic form from

22 brewer's yeast, which is more easily absorbed than the inorganic sodium selenite contained in the

   Men's Vitamins; ██████████████████████████████████████████████████████████. Ex.

23 40, Duffield-Lillico I, p. 1477.

   [13] Bayer's "POV" is a "███████████████████████████████████████" and list "█████

24 ████████████████████████████" and cite all "████████████████████" Beke, 51:18-

25 25, 52:4-21, 64:15-23. ████████████████████████████████████████████████████████

   ████████████████████████████. Beke, 65:15-18, 65:25-66:23, 67:15-68:9, 71:7-17.

26 [14] See also Ex. 42, Durkee, 38:13-19 (████████████████████████████████████████

   ████████████████████████████████████████████████).

27 [15] Ex. 43 (JOHNSBAY-0001719)(OAD substantiation memo re lycopene's prostate benefits); Ex.

28 44, BAYER-0393107-111 (POV for lycopene).

1 ████████████████████████████████████████████████████████" and

2 "████████████████████████████████████████████████████████████

3 ████." JOHNSBAY-2005(FDA response, Qualified Health Claims, dated Nov. 8, 2005). In a July

4 2007, report, the FDA reached the same conclusion that no credible evidence supported a relationship

5 between lycopene and cancers. Ex. 45 (JNCI report published July 10, 2007) at BAYER-01662216.

6       Bayer was well aware of its inability to substantiate its claims.  In November 2008, Bayer's

7 Brand Manager stated that "████████████████████████████" and the FDA's review

8 of the qualified health claims on Bayer's packaging, "████████████████████████

9 ████████████████████████████████████████." Ex. 46, JOHNSBAY-

10 0001379.    Bayer is still struggling to support its prostate health claim.    Ex. 47 (BAYER-

11 0000995)(Bayer memo dated Feb. 11, 2011 re "Substantiation for Selenium").[16]

12       While Bayer had no credible and reliable scientific studies substantiating its prostate health

13 claims, Bayer possessed a number of clinical studies demonstrating the serious, cancer-related risks of

14 ingesting selenium. One study, published in May 2007, concluded that there was no association

15 between selenium use and incidence of prostate cancer, ***and*** that there was "████████████

16 ████████████████████████████████████████████████████████

17 ████ Ex. 49 (JOHNSBAY-0001490-1499). As discussed above, a 2009 study funded by the Dana-

18 Farber Cancer Institute found that taking selenium "████████████████████████

19 ████████████████████████████ Ex. 50 (JOHNSBAY-0001475-

20 1481).  Even though this risk could affect 75% of the male population, Sefali Patel (Bayer's Associate

21 Director for Nutritional Science and New Business), did not deem it necessary for Bayer to stop

22 making the prostate claims because the studies only affected a "████████████████." Patel,

23 164:16-165:8; *see also* Beke, 93:20-97:12 (████████████████████████████

24 

---

25 [16] In December 2008, the Brand Manager for the Men's Vitamins emailed the Brand Director,
warning that ████████████████████████████████████████████ Ex.
26 ████████████████████████████████████████████████████████████
48 (JOHNSBAY-0002296)(█████████████████████████████████████████
27 ████████████████████████████████████████████████████████ Beke, at
86:21-88:8.

28

1   ███████████████████████")[17]

2      These and other studies demonstrate that Bayer's claims can be evaluated on a class-wide

3   basis, as even Bayer concedes. *See* Ex. 41 (JOHNSBAY-0001719)(50+ Network Substantiation

4   memo); Patel at 87:20- 88:10 (the 50+ Network Substantiation memo was still current as of February

5   2009); Patel at 133:3-14, 137:9-139:13 ████████████████████████████████

6   ███████████████████████████), 166:8-167:6; Ex. 39

7   (Bayer's response to Interrogatory No. 1) (identifying 12 studies which Bayer contends supports its

8   claims).

9   **III.    PLAINTIFFS SEEK TO CERTIFY UCL AND CLRA CLAIMS**

10     **A.    UCL**

11     "[T]he primary purpose of the unfair competition law … is to protect the public from

12   unscrupulous business practices." *Consumers Union of U.S., Inc. v. Alta-Dena Certified Dairy*, 4

13   Cal.App.4th 963, 975 (1992), *see also In re Tobacco II Cases ("Tobacco II")*, 46 Cal.4th 298, 312

14   (2009).  The UCL imposes strict liability on anyone who violates its prohibitions and the "scope of

15   the UCL is quite broad." *McKell  v. Wash. Mut., Inc.*, 142 Cal.App.4th 1457, 1471 (2006); *see also*

16   *Cortez v. Purolator Air Filtration Prods. Co.*, 23 Cal.4th 163, 181 (2000) (plaintiff need not show

17   that a UCL defendant intended to injure anyone by its deceitful or unfair conduct).   Because the

18   statute is framed in the disjunctive, a business practice need only meet one of the three criteria

19   ("unlawful," "unfair," or "fraudulent") to violate the UCL.  *McKell*, 142 Cal.App.4th at 1471.

20      "Unlawful" business acts or practices within the meaning of the UCL "'include anything that

21   can properly be called a business practice and that at the same time is forbidden by law.'" *Id*. at 1475

22   (citing *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal.4th 163, 180 (1999))

23   (internal quotations omitted). The UCL therefore permits violations of other laws to be treated as

24   unfair competition that is independently actionable. *Id*. A violation of the underlying law is a *per se*

25

---

26   [17] Bayer also was aware of another study demonstrating the serious, cancer-related risks of ingesting
27   selenium and zinc, another ingredient in Men's Vitamins. The "Zhang" study, published in
     December 2008, found ████████████████████████████████████████████
28   ██████████████████. Ex. 51 at JOHNSBAY-0001482-1489.

1    violation of the UCL. *Saunders v. Superior Court*, 27 Cal.App.4th 832, 838-39 (1994).

2            The "unfair" prong of the UCL may be established by weighing "the utility of the defendant's

3    conduct against the gravity of the harm to the alleged victim." *State Farm Fire & Cas. Co. v.*

4    *Superior Court*, 45 Cal.App.4th 1093, 1104 (1996). A business practice is unfair when it offends an

5    established public policy or when the practice is immoral, unethical, oppressive, unscrupulous or

6    substantially injurious to consumers. *People v. Casa Blanca Convalescent Homes, Inc.*, 159 Cal. App.

7    3d 509, 530 (1984). False advertising has no utility and never constitutes a justified business practice.

8    *Vasquez v. Superior Court*, 4 Cal.3d 800, 808 (1971).

9            To succeed on their claim under the UCL's "fraudulent" prong, Plaintiffs "need only show

10   that 'members of the public are likely to be deceived'" by Bayer's advertising campaign. *Tobacco II*,

11   46 Cal.4th at 312; *see also Lavie v. Procter & Gamble Co.*, 105 Cal.App.4th 496, 507-08 (2003); *see*

12   *also Williams v. Gerber Food Prods. Co.*, 552 F.3d 934, 939 (9th Cir. 2008). A business practice is

13   likely to deceive members of the public where "it is probable that a significant portion of the general

14   consuming public or of targeted consumers, acting reasonably in the circumstances, could be misled."

15   *Lavie*, 105 Cal.App.4th at 508. Unlike common law fraud, Plaintiffs need not prove that every Class

16   member "'was actually deceived, relied upon the fraudulent practice, or sustained any damage.'"

17   *Heighley v. J.C. Penney Life Ins. Co.*, 257 F. Supp. 2d 1241, 1259 (C.D. Cal. 2003); *see also Schnall*

18   *v. Hertz Corp.*, 78 Cal.App.4th 1144, 1167 (2000); *Ewert v. eBay, Inc.*, 2010 WL 4269259, at *7-8

19   (N.D. Cal. Oct. 25, 2010).

20           The UCL similarly prohibits "unfair, deceptive, untrue or misleading advertising." Cal. Bus.

21   & Prof. Code §17200. Advertising is broadly defined to include virtually any statement made in

22   connection with the sale of goods or services, including statements and pictures on labels. *See, e..g,*

23   *Williams*, 552 F.3d at 939. And advertising that is likely to deceive the reasonable consumer violates

24   the false advertising law. *Id.* at 938.

25   **B.     CLRA**

26           A defendant is liable under the CLRA if it misrepresents that its goods possess certain

27   characteristics, uses or benefits that they do not have or advertises goods with the intent not to sell

28   them as advertised. Cal. Civ. Code §1770(a)(5), (7), (9) and (16). The statute is violated "in a

1  transaction intended to result or which results in the sale or lease of goods or services . . . ." Cal. Civ.

2  Code §1770(a).  Any representation in advertising that is likely to deceive the reasonable consumer

3  violates the CLRA.  *Paduano v. Am. Honda Motor Co., Inc.*, 169 Cal.App.4th 1453, 1497 (2009).

4  **IV.**     **THIS CASE SATISFIES THE REQUIREMENTS OF RULE 23**

5          Consumer protection claims are ideal for class certification.  *See, e.g., Amchem Prods. v.*

6  *Windsor*, 521 U.S. 591, 625 (1997); *In re First Alliance Mortg. Co.*, 471 F.3d 977, 992 (9th Cir.

7  2006); *Cal. v. Levi Strauss & Co.*, 41 Cal.3d 460, 471 (1986); *Vasquez*, 4 Cal.3d at 807-08; *Daar v.*

8  *Yellow Cab Co.*, 67 Cal.2d 695, 704 (1967).  Plaintiffs' statutory claims expressly provide for class

9  certification.  The CLRA even includes class action prerequisites in its provisions.  *See* Cal. Civ.

10  Code §1781; *see also* Cal. Bus. & Prof. Code §17203 (claimants "may pursue representative claims

11  or relief on behalf of others" for violations of the UCL, including false advertising).  Such cases are

12  particularly appropriate for class treatment because "the amount of individual recovery would be

13  insufficient to justify bringing a separate action; thus an unscrupulous seller retains the benefits of its

14  wrongful conduct."  *Vasquez*, 4 Cal. 3d at 808; *see also Amchem*, 521 U.S. at 617 (policy at core of

15  class action mechanism is to permit adjudication of small recovery claims).

16          Class certification presents a procedural issue and not a merits determination.  "'In

17  determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs have

18  stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23

19  are met.'"  *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178 (1974) (citation omitted).  The Court

20  may consider evidence which goes to the requirements of Rule 23, but should not weigh competing

21  evidence.  *Staton v. Boeing Co.*, 327 F.3d 938, 954 (9th Cir. 2003).  As detailed below, Plaintiffs

22  satisfy each of the prerequisites of Rule 23(a) and (b)(3).

23          **A.**     **Plaintiffs Satisfy the Rule 23(a) Prerequisites**

24          Rule 23(a) enumerates four prerequisites for class certification, referred to as: (1) numerosity;

25  (2) commonality; (3) typicality; and (4) adequacy.  Each of these requirements is met here.

26                  **1.**     **Numerosity**

27          Rule 23(a)(1) requires that "the class is so numerous that joinder of all members is

28  impracticable." Fed. R. Civ. P. 23(a); *Wiener*, 255 F.R.D. at 664.  Here, the numerosity requirement

1   is readily met because it is difficult or inconvenient to join all members of the proposed Class.  *Id.*

2   Bayer specified that between 2005-2009, its national net sales of Men's Health totaled in excess of

3   $189 million and between 2007-2009, its national net sales of Men's 50+ totaled in excess of $39

4   million.  Ex. 39 (Bayer's response to Interrogatory Nos. 8-9).  Given these large sales numbers, it is

5   reasonable to assume that a sufficient amount of individuals purchased the Men's Vitamins in

6   California[18] to satisfy the numerosity requirement.  "'Where the exact size of the class is unknown but

7   general knowledge and common sense indicate that it is large, the numerosity requirement is

8   satisfied.'"  *Charlebois v. Angels Baseball*, *LP*, 2011 WL 2610122, at *4 (C.D. Cal. June 30, 2011)

9   (citation omitted); *see also Newberg*, §3.3 (same).

10                    **2.      Commonality**

11          Rule 23(a)(2) commonality is a minimal requirement that may be met by one common issue of

12   law or fact.  *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998); *First Alliance*, 471 F.3d

13   at 990-91.  This prerequisite is readily met in this case.  To quote the Court in *Wiener*: "The proposed

14   class members clearly share common legal issues regarding [Defendant's] alleged deception and

15   misrepresentations in its advertising and promotion of the Products."  255 F.R.D. at 664-65.  Here, as

16   well, common issues include whether Bayer's advertising of the Men's Vitamins was deceptive and

17   likely to deceive the public.  Complaint, ¶61.

18                    **3.      Typicality**

19          Rule 23(a)(3) typicality is satisfied where the Plaintiffs' claims are "reasonably co-extensive"

20   with absent Class Members' claims; they need not be "substantially identical."  *Hanlon*, 150 F.3d at

21   1020; *see also Wiener*, 255 F.R.D. at 665.  The test for typicality "is whether other members have the

22   same or similar injury, whether the action is based on conduct which is not unique to the named

23   Plaintiffs, and whether other class members have been injured by the same course of conduct."

24   *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (citation omitted).  This is "to assure

25

26   [18] Further, Plaintiffs have defined an ascertainable Class.  Here, the defined Class includes all California residents who purchased Men's Vitamins and non-California residents who purchased
27   Men's Vitamins in California. This definition is precise, with objective characteristics and transactional parameters. *See, e.g., Churchhill Village, L.L.C.*, 169 F.Supp.2d 1119, 1126-27 (N.D.
28   Cal. 2010); *Norwest Mortgage, Inc. v. Superior Court*, 72 Cal.App.4th 214, 222 (1999).

1 that the interest of the named representative aligns with the interests of the class." *Id*.  For example,

2 the court in *Keilholtz v. Lennox Health Prods., Inc.*, 268 F.R.D. 330, 338 (N.D. Cal. 2010), in

3 certifying UCL and CLRA claims, found that the typicality requirement was satisfied because:

4 "Plaintiffs' claims are all based on Defendants' sale of allegedly dangerous fireplaces without

5 adequate warnings." *Id.* at *5.

6      Typicality is met here as Plaintiffs and the proposed Class assert exactly the same claim,

7 arising from the same course of conduct – Bayer's marketing campaign.  Both Men's Vitamin

8 packages prominently and repeatedly featured the identical "supports prostate health" claim.

9 Plaintiffs and Class members all purchased the Men's Vitamins and were all exposed to the same

10 alleged misrepresentations on the packages and advertisements.[19]  And Plaintiffs, like every Class

11 member, were injured when they paid money to purchase the Men's Vitamins.

12                    **4.      Adequacy of Representation**

13      Adequacy requires that "the representative parties will fairly and adequately protect the

14 interests of the class." Fed. R. Civ. P. 23(a)(4).  Adequacy is satisfied where (i) counsel for the class

15 is qualified and competent to vigorously prosecute the action, and (ii) the interests of the proposed

16 class representatives are not antagonistic to the interests of the Class.  *See, e.g., Staton,* 327 F.3d at

17 957; *Hanlon*, 150 F.3d at 1020; *Molski v. Gleich*, 318 F.3d 937, 955 (9th Cir. 2003), *overruled on*

18 *other grounds in Dukes v. Wal Mart Stores, Inc.*, 603 F.3d 571 (9th Cir. 2010); *Wiener*, 255 F.R.D. at

19 667.

20      The interests of Plaintiffs and the members of the Class are fully aligned in determining

21 whether Bayer's advertisements of the OAD products were likely to deceive a reasonable consumer.

22 

23 [19] Plaintiff Johns paid about $8 to purchase OAD Men's Health after he read the prostate claim on
the package label and saw Bayer's Men's Vitamin television advertisements and, as he testified in
24 his deposition, "supports…prostate health" was "one of the reasons" he purchased the product.
Johns, 23:1-4.  *See also* Ex. 52, Johns, 93:21-94:5 ("as a consumer, when I go and look at packaging,
25 I rely on the fact of what it's saying…. I read [the prostate health claim] [and] I assume that there's
ingredients in the bottle that are going to do something more than nothing, right?  There's some
added benefit to me that I'm getting from this product by purchasing it.").
26   Plaintiff Bordman paid the retail price for several bottles of OAD Men's 50+ after he read the
prostate claim and saw Bayer's Men's Vitamin television advertisements on the label and, as he
27 testified in his deposition, he "relied upon reading the packaging," specifically the representations
about "prostate health and with the selenium." Ex. 53. Bordman, 224:9-21.

28

1   As Plaintiff Johns testified, the reason he brought this lawsuit is because he "bought a bottle of

2   vitamins, promising to do one thing, but, in fact, it doesn't do what it promised on the packaging."

3   Johns, 11:2-5.  Further, Plaintiffs also are aware of their responsibilities as Class representatives,

4   including remaining knowledgeable and informed about the litigation, acting in the best interests of

5   the Class and participating in the litigation as needed, and are fully prepared to continue to fulfill

6   those responsibilities throughout the litigation.[20]   This is all that is required to satisfy the first prong

7   of the adequacy requirement.  *See Wiener*, 255 F.R.D. at 667.

8        Plaintiffs have satisfied the second prong of the adequacy requirement by retaining counsel

9   with significant experience in prosecuting large consumer fraud class actions, including numerous

10  false advertising cases, who should also be appointed Class counsel.  *See* Exs. 54-55 (firm resumes).

11  The adequacy requirement is met.[21]

12       **B.      Rule 23(b)(3) Is Satisfied**

13       In addition to the prerequisites set forth in Rule 23(a), a class must also be maintainable under

14  Rule 23(b).  *Weiner*, 255 F.R.D. at 668.  Under Rule 23(b)(3), certification is appropriate if:

15  (i) questions of law or fact common to the members of the class predominate over any questions

16  affecting only individual members; and (ii) a class action is superior to other available methods for

17  the fair and efficient adjudication of the controversy.  Fed. R. Civ. P. 23(b)(3); *Local Joint Exec. Bd.*

18  *of Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc.*, 244 F.3d 1152, 1162-63 (9th Cir. 2001);

19  *Hanlon*, 150 F.3d at 1022.  Rule 23(b)(3) encompasses those cases "in which a class action would

20  achieve economies of time, effort, and expense, and promote...uniformity of decision as to persons

21  similarly situated, without sacrificing procedural fairness or bringing about other undesirable results."

22

---

23  [20] During his two-hour deposition, Plaintiff Johns demonstrated his thorough knowledge of his class
    representative responsibilities and the class he seeks to represent (79-80), testified that he has

24  reviewed the Complaint, Amended Complaint and discovery responses (28, 42, 77 and 85), and
    described the relief sought (40-41).  During his four-hour deposition, Plaintiff Bordman testified that

25  he is knowledgeable of his class representative responsibilities and the class he seeks to represent
    (190, 198, 201), is motivated to represent the Class (29-30), reviewed the Amended Complaint and

26  discovery responses (98-100, 145-146, 214-215, 217, 220), is knowledgeable about the relief sought
    (192) and appeared in court when required (210).

27  [21] Rule 23(g)(1) also requires the Court to appoint class counsel.  Specifically, Plaintiffs request the
    Court appoint Bonnett, Fairbourn, Friedman & Balint, P.C., and Blood Hurst & O'Reardon, LLP as

28  Class Counsel.

1    *Amchem*, 521 U.S. at 623; *Wiener*, 255 F.R.D. at 668.

2          The Rule 23(b)(3) predominance inquiry tests whether proposed classes are "sufficiently

3    cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623.  "Rule 23(b)(3)

4    focuses on the relationship between the common and individual issues." *Hanlon*, 150 F.3d at 1022.

5    "When common questions present a significant aspect of the case and they can be resolved for all

6    members of the class in a single adjudication, there is clear justification for handling the dispute on a

7    representative rather than on an individual basis." *Id.* (citation omitted).  As such, "[w]hen one or

8    more of the central issues in the action are common to the class and can be said to predominate, [a

9    class action] will be considered proper...even though other matters will have to be tried separately."

10   *Gartin v. S & M Nutec, LLC*, 245 F.R.D. 429, 435 (C.D. Cal. 2007) (internal citation omitted and

11   alteration in original); *Wiener*, 255 F.R.D. at 668.

12                    **1.        Predominance is Satisfied**

13                         **a.        Common Issues Predominate**

14         "Predominance is a test readily met in certain cases alleging consumer or securities

15   fraud . . . ." *Amchem*, 521 U.S. at 625.  In evaluating whether common issues predominate over

16   individual issues, the class-wide issues should constitute a significant aspect of the case.  The

17   predominance "inquiry trains on legal or factual questions that qualify each class member's case as a

18   genuine controversy."  *Id.* at 623.  The requirement demands only predominance of common

19   questions, not exclusivity or unanimity of them.   Rule 23(b)(3); *see also In re Visa*

20   *Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 140 (2d Cir. 2001).   Common questions

21   predominate in this litigation.

22         The overriding common questions in this litigation are whether Bayer misrepresented that the

23   OAD Men's Vitamins "support prostate health" and whether the misrepresentations were likely to

24   deceive a reasonable consumer.  These predominant questions are binary – either the advertisements

25   were misleading or not, and Bayer's prostate claim is true, or it is false.

26         It is black letter law that California consumer protection laws take an objective approach; that

27   of the ***reasonable*** consumer, not the ***particular*** consumer.  *Williams,* 552 F.3d at 938.  The import of

28   this is as noted by the Ninth Circuit in construing Hawaii's similar consumer protection laws:

1

2

3

> [T]here is no reason to look at the circumstances of each individual purchase in this case, because the allegations of the complaint are narrowly focused on allegedly deceptive provisions of Midland's own marketing brochures, and the fact-finder need only determine whether those brochures were capable of misleading a *reasonable consumer*.

4 *Yokayama v. Midland National Life Ins. Co.*, 594 F.3d 1087, 1089, 1094 (9th Cir. 2010) (holding

5 "[b]ecause the proper inquiry under Hawaii law considers the effect upon a reasonable consumer, not

6 a particular consumer, there are no individual issues of reliance under Rule 23.") (emphasis added).

7 If each Class member were to pursue his or her claim individually, the evidence necessary to support

8 the individual claims would be identical in each case. And, Plaintiff and all Class Members are

9 entitled to the same legal remedies premised on the same alleged wrongdoing.   Under these

10 circumstances, there is sufficient basis to find that the requirements of Rule 23(b)(3) are present. *See*

11 *Weiner*, 255 F.R.D. at 669 (predominance satisfied when alleged misrepresentation of product's

12 health benefits were displayed on every package).

13     No other individualized issues will defeat predominance.  Even though Bayer advertised

14 Men's Vitamins through various media, all of the media worked "███████████████████

15 ██████" to "████████████████" of prostate health. Nunziata, 43:5-23. ████████████

16 ████████████████████████████" *i.e.*, the Men's Vitamins were "████████

17 ████████████████████████" Nunziata, 17:12-24, 19:21-20:4 (emphasis

18 added).  *Compare Fitzpatrick,* 263 F.R.D. at 700 (finding defendant's advertising statements were

19 "not so significant as to preclude a fact finder from evaluating whether General Mills' overarching

20 theme that Yo-Plus aids in the promotion of digestive health is 'deceptive'").[22]  Further, regardless of

21 what mix of print, TV, internet or radio advertisements Plaintiffs and Class members were exposed

22 to, because the prostate health claim was on each and every package of Men's Vitamins sold during

23 the Class period Plaintiffs and each Class member necessarily saw it.

24     The UCL claim does not require classwide proof or reliance or causation. *See Tobacco II*, 46

25 

---

26 [22] *See also Wiener*, 255 F.R.D. at 669-670 (predominance satisfied where defendant's health benefit

27 claims were "explicitly and continually" presented through various mediums including product labels and televisions, print and internet advertising); *Johnson*, 2011 WL 1514702, at *4 (predominance satisfied where defendant's "packaging and marketing communicated a persistent and material message" throughout "different mixes of packages and advertisements").

28

1    Cal.4th at 321. As to the CLRA, reliance may be properly inferred "wherever there is a showing that a

2    misrepresentation was material." *Id.* at 327; *Wiener*, 255 F.R.D. at 669; *Johnson,* 2011 WL 1514702,

3    at *2.  An inference of reliance arises as to an entire class when material misrepresentations were

4    made to all class members. *See Vasquez,* 4 Cal.3d at 814 ("It is sufficient for our present purposes to

5    hold that if the trial court finds material misrepresentations were made to the class members, at least

6    an inference of reliance would arise as to the entire class."); *see also Johnson*, 2011 WL 1514702, at

7    *2 ("a CLRA claim can be litigated on a classwide basis where the record permits an inference of

8    common reliance to the class") (internal quotations and citations omitted).   In order for a

9    misrepresentation of fact to be material, the misrepresentation must have "induced the plaintiff to

10   alter his position to his detriment. Stated in terms of reliance, materiality means that without the

11   misrepresentation, the plaintiff would not have acted as he did." *Wiener*, 255 F.R.D. at 668 (citing

12   *True v. Am. Honda Motor Co., Inc.*, 520 F.Supp.2d 1175, 1182 (C.D. Cal. 2007)).[23]  Importantly, the

13   misrepresentation need not be the "sole or even the predominating or decisive factor influencing his

14   conduct…it is enough that the representation played a substantial part, and so had been a substantial

15   factor, in influencing his decision.'" *Id*. at 326-27; *see also Kwikset Corp. v. Superior Court*, 51 Cal.

16   4th 310, 326-327 (2011) (same).

17          Here, Plaintiffs' CLRA claim satisfies the requirements for an inference of reliance: material

18   prostate health representations were made to all potential Class members who, by purchasing one of

19   the Men's Vitamin products, acted in a manner "consistent with reliance upon the representation."

20   *Wiener*, 255 F.R.D. 668.  When presented with analogous facts, the *Wiener* court found:

21          In this case, Plaintiff's CLRA…claims satisfy the requirements for an inference of
             reliance…Because, by definition, ***every member of the class must have bought one of***
22          ***the Products and, thus, seen the packaging, Plaintiffs have succeeded in showing***
             ***that the alleged misrepresentations were made to all class members***….Furthermore,
23          the Court finds that the misrepresentations at issue were material…The record clearly
             establishes that the characteristic that distinguishes these products from others on the
24          market is their alleged health benefit. . . The Court is aware that many factors
             influence   all   consumers'   purchasing   decisions…yet   given   that   the   alleged

25   _____

26   [23] *See also Johnson*, 2011 WL 1514702, at *2 (a representation is material "if a reasonable man
     would attach importance to its existence or nonexistence in determining his choice of action in the
27   transaction in question") (citation omitted); *Martinez v. The Welk Group, Inc.*, 2011 WL 2173764, at
     *6 (S.D. Cal. June 2, 2011) (same).
28

1  misrepresentations are the distinguishing characteristics of the products, *the Court*
   *finds that these representations induced consumer purchases because without the*
2  *alleged misrepresentations, there is no reason, even with sales, coupons, or other*
   *promotions, to suggest that purchasers would have selected the Products over other*
3  *Dannon products or similar, generally less expensive, products by other brands*.

4  *Wiener*, 255 F.R.D. at 669-670 (emphasis added). Here, too, the prostate health benefit claim was

5  the distinguishing characteristic of the Men's Vitamins. Because Plaintiffs will demonstrate class-

6  wide exposure through common evidence, proof of reliance may be inferred from circumstantial

7  evidence warranting submission to a jury without testimony from each Class member.

8      **b.**    **Determination of Relief Does Not Defeat Predominance**

9         Here, the relief requested by Plaintiffs does not defeat predominance. "The amount of

10  damages is invariably an individual question and does not defeat class action treatment." *Blackie v.*

11  *Barack*, 524 F.2d 891, 905 (9th Cir. 1975). Thus, "[i]ndividual damage issues should not, except in

12  extraordinary situations, have any adverse effect on the propriety of aggregate class judgments as a

13  proper means for determining the defendant's liability to the class." 6 A. Conte & H. Newberg,

14  *Newberg on Class Actions*, §10:2 (4th ed. 2002) ("*Newberg*"). "Where, as here, common questions

15  predominate regarding liability, the courts generally find the predominance requirement to be

16  satisfied even if individual damages issues remain." *Smilow v. SW Bell Mobile Sys., Inc.*, 323 F.3d 32,

17  40 (1st Cir. 2003) (citing *In re Visa Check/MasterMoney*, 280 F.3d at 139); *Bogosian v. Gulf Oil*

18  *Corp.*, 561 F.2d 434, 456 (3d Cir. 1977); *Gold Strike Stamp Co. v. Christensen*, 436 F.2d 791, 798

19  (10th Cir. 1970)). "[T]he ultimate goal in class actions is to determine the aggregate sum, which fairly

20  represents the collective value of claims of individual class members." *Newberg, supra,* §10:2. Here,

21  Bayer possesses the sales information from which damages can be determined. *See, e.g.*, Ex. 56

22  (BAYER-0122361)(█████████████████████████████████████████████

23  ███████████████████ Kolpon at 83:24-85:2 █████████████

24  ████████████████████████████████████████████████████

25  █████████████); 153:12–154:13 (█████████████████████████

26

27

28

1    ██████████████████████████████████); Ex. 57[24] (BAYER-0010902-54)

2    (██████████████████████████████████████████████████████████████████

3    ████); Ex. 58 (JOHNSBAY-0004685) (███████████████████████).

4           In *Wiener*, the court found that Defendant overstated the difficulties in calculating class

5    damages because actual damages for plaintiff's CLRA claim "can be calculated by subtracting the

6    value of the product without the claimed health benefit, a uniform value to be determined based on

7    the evidence presented at trial, from the price the particular class member is able to prove he or she

8    paid." *Wiener*, 255 F.R.D. at 670 (citing *Colgan v. Leatherman Tool Group, Inc.*, 38 Cal.Rptr.3d 36,

9    42-43 (Cal. Ct. App. 2006).[25]   Alternatively, damages may be calculated by adding together the

10   purchase price paid by Class members.  *FTC v. Figgie Int'l*, 994 F.2d 595, 606 (9th Cir. 1993).[26]

11          The restitution permitted under the CLRA and UCL may be similarly determined.  As noted in

12   *Wiener*: "with respect to the restitution permitted under the CLRA and UCL, the Court has 'very

13   broad' discretion to determine an appropriate remedy award as long as it is supported by the by the

14   evidence and is consistent with the purpose of restoring to the plaintiff the amount that the defendant

15   wrongfully acquired."  *Wiener*, 255 F.R.D. at 670-71 (citing *Colgan*, 38 Cal.Rptr.3d at 58-63).

16          While Bayer may dispute Plaintiffs' alternatives for calculating relief in this case, that is an

17   issue that can be determined on a classwide basis and, thus, does not defeat certification.

18   Accordingly, where, as here, Plaintiffs' methods of proof are sufficiently reliable, there is "no room"

19   for Bayer to complain because "[a]ggregate proof of the defendant's monetary liability is no more

20   unfair than class treatment of other elements of liability." *Newberg*, §10:2.[27]

21   _____

22   [24] The non-Bates-labeled native version of this document is submitted as an exhibit because the TIFF
     version is unreadable.

23   [25] To the extent that any information might possibly result in a damage calculation that is higher than
     the actual amount, more conservative calculations can be made, going as low as Bayer's net sales

24   figures for the subject products and its comparable products. Bayer cannot complain about such an
     approach because it is properly only interested in the aggregate amount of an award of damages or

25   restitution. *Hilao v. Estate of Marcos*, 103 F.3d 767, 786 (9th Cir. 1996).

26   [26] Because the UCL was patterned after the FTC Act, decisions by federal courts construing the FTC
     Act "are more than ordinarily persuasive" in construing the UCL.  *Cel-Tech*, 20 Cal.4th at 185.

27   [27] This case poses no extraordinary distribution issues. The Court may award individual damages or
     restitution based on a claimant's submission of the amount of product purchased or on a *per capita* or

28   average methodology basis, processing claims by a claims administrator supervised by Class counsel

**C.  A Class Action Is Superior to Other Available Methods of Adjudicating the Issues Raised**

Rule 23(b)(3) sets forth the relevant factors for determining whether "a class action is superior to other available methods for the fair and efficient adjudication of the controversy."  These factors include: (i) the class members' interest in individually controlling separate actions; (ii) the extent and nature of any litigation concerning the controversy already begun by or against class members; (iii) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (iv) the likely difficulties in managing a class action. Fed.R.Civ.P. 23(b)(3). "'[C]onsideration of these factors requires the court to focus on the efficiency and economy elements of the class action so that cases allowed under subdivision (b)(3) are those that can be adjudicated most profitably on a representative basis.'"  *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1190 (9th Cir. 2001) (citation omitted); *see also Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996) (finding the superiority requirement satisfied where granting class certification "will reduce litigation costs and promote greater efficiency").

The Rule 23(b)(3) "superiority" factors weigh heavily in favor of class certification here. Liability in this action will turn on whether Bayer's advertisements relating to consumer products were false or misleading; meaning judicial efficiency weighs in favor of a class action.  Likewise, it is not economically feasible for the many thousands of Class members to pursue their claims against Bayer on an individual basis given that the amount in controversy is in the range of less than $10 per purchase compared to the enormous expense associated with litigating the question of whether Bayer' claims are adequately supported by science.  *Hanlon*, 150 F.3d at 1023; *Deposit Guar. Nat'l Bank v. Roper*, 445 U.S. 326, 338-39 (1980); *Vasquez*, 4 Cal. 3d at 808.  In fact, "[i]f potential class members were forced to pursue their claims individually, a number of disadvantages would arise, including 'less litigation or settlement leverage, significantly reduced resources and no greater prospect for recovery.'"  *Wiener*, 255 F.R.D. at 671 (citing *Hanlon*, 150 F.3d at 1023).  And, because the proposed

_____

or, if needed, a special master or court-appointed counsel. *Newberg*, §10:12 (citing *Visa Check/MasterMoney*, 280 F.3d 124). Further, under the UCL claim, California law requires Bayer to find class members. *Kraus v. Trinity Management Services, Inc.*, 23 Cal. 4th 116, 138 (2000) *superseded on other grounds by* Cal. Bus. & Prof. Code § 17204.

1   Class involves only California purchasers and non-California residents that purchased the Men's

2   Vitamins in California, having the litigation occur in a California court is preferable.  *See Wiener*, 255

3   F.R.D. at 671.

4          Consideration of the alternatives "underscores the wisdom of a class action in this instance,"

5   because it is clear that "[i]f plaintiffs cannot proceed as a class, … most will be unable to proceed as

6   individuals because of the disparity between their litigation costs and what they hope to recover."

7   *Wiener*, 255 F.R.D. at 672 (citations omitted).  Thus, there simply is no other practical method of

8   adjudicating these claims.

9   **V.        CONCLUSION**

10         Based on the foregoing, Plaintiffs' motion for class certification should be granted.

11

12  DATED: August 17, 2011                    **BONNETT, FAIRBOURN, FRIEDMAN**
                                               **& BALINT, P.C.**
13

14                                             */s/ Patricia N. Syverson*
                                               Andrew S. Friedman
15                                             Elaine A. Ryan
                                               Patricia N. Syverson
16                                             2901 N. Central Avenue, Suite 1000
                                               Phoenix, Arizona  85012-3311
17                                             Telephone:  602-776-5925
                                               Facsimile:  602-798-5860
18
                                               TODD D. CARPENTER (CA 234464)
19                                             600 West Broadway, Suite 900
                                               San Diego, CA 92101
20                                             Telephone:  619/756-7095
                                               602/798-5860 (fax)
21                                             tcarpenter@bffb.com

22                                             **PISCITELLI LAW FIRM**
23                                             FRANK E. PISCITELLI, JR,
                                               55 Public Square, Suite 1950
24                                             Cleveland, Ohio 44113
                                               Telephone: (216) 931-7000
25                                             Frank@feplaw.com

26                                             **CLIMACO, LEFKOWITZ, PECA**
27                                             **WILCOX & GAROFOLI CO., L.P.A.**
                                               JOHN R. CLIMACO, ESQ.
28                                             JOHN A. PECA

PATRICK G. WARNER
55 Public Square, Suite 1950
Cleveland, Ohio 44113
216/621-8484 (Telephone)
216/771-1632 (Telecopier)
jrclim@climacolaw.com
japeca@climacolaw.com
pgwarn@climacolaw.com

**BLOOD HURST & O'REARDON, LLP**
TIMOTHY G. BLOOD
THOMAS J. O'REARDON
600 B Street, Suite 1550
San Diego, CA 92101
Telephone: 619/338-1100
619/338-1101 (fax)
tblood@bholaw.com
toreardon@bholaw.com

*Attorneys for Plaintiffs*

1

**CERTIFICATE OF SERVICE**

2          I hereby certify that on August 17, 2011, I electronically filed the foregoing with the Clerk of

3   the Court using the CM/ECF system which will send notification of such filing to the e-mail

4   addresses denoted on the Electronic Mail notice list, and I hereby certify that I have mailed the

5   foregoing document or paper via the United States Postal Service to the non-CM/ECF participants

6   indicated on the Manual Notice list.

7          I certify under penalty of perjury under the laws of the United States of America that the

8   foregoing is true and correct.  Executed on August 17, 2011.

9

10                                                    /s/ *Patricia N. Syverson*
                                                     Patricia N. Syverson

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CERTIFICATE OF SERVICE