02/02/06        **Nutritional Science:**        1
**Plan of Principles**

Table of Contents

- I. Purpose and Objectives
- II. Summary
- III. Science
- IV. Nutrition
- V. Medical Science:
  - A. Claims
  - B. Health Claim
  - C. Qualified Health Claim
  - D. Structure/Function Claims
  - E. Nutrient Content
- VI. Evidence:
  - A. Claim Meaning
  - B. Evidence Relationship
  - C. Evidence Quality:
    1. Intervention
    2. Observational
    3. Bias
    4. Confounders
    5. Quality Assessment Criteria
    6. Population Studied
    7. General Design Factors
    8. Data Analysis
    9. Peer Review
  - D. Evidence Totality
- VII. Claim Types:
  - A. Wheel Claims
  - B. Bulleted Claims
  - C. Product Name Claims
- VIII. Use of a Key Opinion Leader (KOL) for substantiation
- IX. The 10% rule
- X. Drug Safety POV
- XI. Updating frequency for claims

CONFIDENTIAL

BAYER-0125704

02/02/06          **Nutritional Science:**      2
**Plan of Principles**

### I. Purpose and Objectives:
The purpose of the Nutritional Science: Plan of Principles is to provide general guiding principles by which the Nutritional Science and New Business department of Medical Affairs conducts business. Our main objective is to have a clear definition and understanding of the science behind each of our ingredients, and to have clear guidelines for the evaluation of that science and its applicability to the claims our products make. This document will be updated from time to time to reflect any changes in our policies and practices.

### II. Summary:
The Plan of Principles for the Nutritional Science and New Business department of Medical Affairs is a working document that contains the summary knowledge of how and why we apply the level(s) of science that we do and examples of this application in practice. It covers medical claims of safety and efficacy and how those claims are substantiated, as well as the regulatory definition for the three categories of claims, Health Claims, Nutrient Content Claims and Structure/Function Claims. These principles are related to substantiation work we do in conjunction with Regulatory Affairs, Marketing and the Law and the Patents departments.

### III. Science:
For our purposes, the definition of science is essentially the same as the following definition found on Merriam-Webster's Website, www.webster.com. **1:** the state of knowing: knowledge as distinguished from ignorance or misunderstanding. **2a:** a department of systematized knowledge as an object of study. **b:** something that may be studied or learned like systematized knowledge **3a:** knowledge or a system of knowledge covering general truths or the operation of general laws especially as obtained and tested through the scientific method **b:** such knowledge or such a system of knowledge concerned with the physical world and its phenomena.

### IV. Nutrition:
The definition of nutrition as found in Stedman's Medical Dictionary 26th edition is as follows: The study of the food and liquid requirements of human beings for normal physiologic function, including energy, maintenance, growth, activity, reproduction, and lactation.

Understanding the science of nutrition while at the same time gaining the knowledge that covers the facts about our ingredients and their respective claims is what we do. It is an integral part of our responsibilities when developing products, and when substantiating claims made for those products.

The following section on Medical Science will describe our "state of knowing" and how we apply such knowledge.

### V. Medical Science:

    **A. Claims:**
Any claim (e.g. explicit or implied statement of benefit appearing on package or in an advertisement or promotion) made regarding our products requires substantiation. For dietary supplements there are three categories of claims allowed under the FDA:

CONFIDENTIAL        BAYER-0125705

Case: 3:09-cv-01925-AJB-DHB#: Document 73-3 Filed 08/17/11 Page 3 of 9
Case: 1:10-cv-00224-JG Doc #: 106-1 Filed: 06/24/11 3 of 9. PageID #: 2185

02/02/06　　　　　　　**Nutritional Science:**　　　　　　　3
　　　　　　　　　　　**Plan of Principles**

Health Claims (Authorized Health Claims and Qualified Health Claims), Structure/Function Claims and Nutrient Content Claims, which can be defined as follows.

B. **Health Claim:**
Health Claims are the strongest claims that may be made for dietary supplements and speak to reducing the risk of disease. Health Claims are approved by the FDA if they meet the "significant scientific agreement" level of substantiation. They are made on the labeling of qualifying food or dietary supplements. The definition found on the FDA Website, www.fda.gov is "Health Claims describe a relationship between a food, food component, or dietary supplement ingredient, and reducing risk of a disease or health-related condition." A "Health Claim" by definition has two essential components: (1) a substance (whether a food, food component, or dietary ingredient) and (2) a disease or health-related condition. One example of an approved Health Claim is "Healthful diets with adequate folate may reduce a woman's risk of having a child with a brain or spinal cord defect."

C. **Qualified Health Claim:**
A Qualified Health Claim is allowed by the FDA but does not meet the significant scientific agreement standard and hence contains a qualifying statement. The description found on the FDA Website is: "FDA's 2003 *Consumer Health Information for Better Nutrition Initiative* provides for the use of Qualified Health Claims when there is emerging evidence for a relationship between a food, food component, or dietary supplement and reduced risk of a disease or health-related condition. In this case, the evidence is not strong enough to meet the significant scientific agreement standard required for FDA to issue an authorizing regulation. Qualifying language is included as part of the claim to indicate that the evidence supporting the claim is limited." One example of a Qualified Health Claim is "Supportive but not conclusive research shows that consumption of EPA and DHA omega-3 fatty acids may reduce the risk of coronary heart disease. One serving of [name of food] provides [x] grams of EPA and DHA omega-3 fatty acids. [See nutrition information for total fat, saturated fat and cholesterol content.]"

D. **Structure/Function Claims:**
The most common claims used on the labeling of dietary supplements, and the form used on nearly all of our products, are considered Structure Function Claims. They are authorized by the Dietary Supplement Health and Education Act (DSHEA). The definition with an example as found on the FDA Website is: "Structure Function Claims describe the role of a nutrient or dietary ingredient intended to affect normal structure or function in humans, for example, "calcium builds strong bones." In addition, they may characterize the means by which a nutrient or dietary ingredient acts to maintain a structure or function, for example, "fiber maintains bowel regularity," or "antioxidants maintain cell integrity," or they may describe general well being from consumption of a nutrient or dietary ingredient. Structure Function Claims may also describe a benefit related to a nutrient deficiency disease (like vitamin C and scurvy), as long as the statement also tells how widespread such a disease is in the United States. The manufacturer is responsible for ensuring the accuracy and truthfulness of these claims; they are not pre-approved by FDA but must be truthful and not misleading. If a dietary supplement label includes such a claim, it must state in a "disclaimer" that FDA has not evaluated the claim. The disclaimer must also state that the dietary supplement product is not intended to "diagnose, treat, cure or prevent any disease."

02/02/06  **Nutritional Science:**  4
**Plan of Principles**

### E. Nutrient Content:
Claims based on nutrient content are allowed, but are not used to the same extent as the other three types just described. The definition with an example as found on the FDA Website is as follows. "Nutrient Content Claims describe the level of a nutrient or dietary substance in the product, using terms such as *free*, *high*, and *low*, or they compare the level of a nutrient in a food to that of another food, using terms such as *more*, *reduced*, and *lite*. An accurate quantitative statement (e.g., 200 mg of sodium) that does not "characterize" the nutrient level may be used to describe any amount of a nutrient present. However, a statement such as "only 200 mg of sodium" characterizes the level of sodium as being low and would therefore need to conform to the criteria of an appropriate nutrient content claim or carry a disclosure statement that it does not comply with the claim. All Nutrient Content Claim regulations apply only to those nutrients or dietary substances that have an established daily value. *Percentage claims for dietary supplements are another category of nutrient content claims.* These claims are used to describe a percentage level of a dietary ingredient for which there is no established Daily Value. Examples include simple percentage statements such as "40% omega-3 fatty acids, 10 mg per capsule," and comparative percentage claims, e.g., "twice the omega-3 fatty acids per capsule (80 mg) as in 100 mg of menhaden oil (40 mg)."

## VI. Evidence:
Our basic principle when considering evidence for advertising claim substantiation is to require such evidence to be consistent with the criteria outlined by the Federal Trade Commission (FTC). The FTC's guidance can be found at http://www.ftc.gov/bcp/conline/pubs/buspubs/dietsupp.htm. Here follows a discussion of certain of these criteria as applied by Bayer.

When we are researching a topic, with the intention of ultimately substantiating a claim, there are four basic standards to follow. These standards are also set forth by the FTC and adopted by the FDA:
- First, one must *understand the meaning of the claims* being made.
- Second, one must have a firm *understanding of the relationship of the evidence* to the claim being made.
- Third, one must establish an *understanding of the quality of the evidence.*
- Fourth, one must *understand the totality of the evidence.*

### A. Claim Meaning:
Clearly identifying *the meaning of each claim* is an essential step in the substantiation process. Often we receive a "wish list" of claims from our marketing partners and must then match the available science to this list. Since a proposed claim may have more than one reasonable interpretation, it is imperative to identify all alternative reasonable interpretations and have substantiation for each interpretation. If a claim can be interpreted more than one way, and we cannot substantiate each interpretation, the claim will need to be modified so as to eliminate unsubstantiated interpretations.

### B. Evidence Relationship:
In *understanding the relationship of the evidence* to the claims being made there are several factors to keep in mind. We will need to consider what exactly was studied. For example, was it an ingredient studied or was it a component of some type of food? If it were the single ingredient, the study would more likely be sufficient for substantiation; however if it was a component of a food, and the food itself was tested, it might not be

| 02/02/06 | **Nutritional Science:** | 5 |
|---|---|---|
| | **Plan of Principles** | |

adequate for substantiation. In addition, we will make sure that the claim being made accurately reflects the endpoints in the studies used for substantiation.

Furthermore, substantiation should relate to the population group to which the product will be marketed. For example, if the studies for a particular ingredient were done in an elderly population and the product we are working on is a children's chewable, the studies may not be appropriate to substantiate this product.

C. **Evidence Quality:**
The *quality of the evidence* will be judged by several criteria, such as the study population, the study design including presence or absence of a placebo/control, outcome measures, and statistical analysis. The highest level of substantiation is a trial with some or all of the following features: randomized, double-blind, parallel-group, and placebo-controlled. The following lists are the types of studies that we would refer to and utilize in order of preference.

1. **Intervention:**
Randomized, double-blind, parallel-group, placebo-controlled. These are considered to be the most reliable studies for determining a cause and effect relationship.

2. **Observational:**
Case reports, case-series studies, case-control studies, cohort studies, cross-sectional or prevalence studies, time-series studies, epidemiological studies, and meta-analyses.

Study design should be taken into consideration as it may affect the quality of the study. As we are reviewing studies for inclusion as substantiation for any particular claim, the following design factors are to be taken into consideration.

3. **Bias**:
Lack of appropriate blinding, number of subjects screened versus participate, demographics, compliance, dropouts, safety issues, sponsorship, and reproducibility of results.

4. **Confounders:**
Variability in the quantity of the ingredient being studied and presence of other ingredients or factors that may effect the outcome or results.

5. **Quality Assessment Criteria:**
Adequate and clear design that includes the following: Clearly defined questions, methodology appropriate to the study, duration of the study, identified or controlled potential confounding factors, assessed and explained dropouts.

6. **Population Studied:**
Sample size large enough to provide sufficient statistical power, study population representative of the population targeted for the claim, inclusion and exclusion criteria clearly stated.

7. **General Design Factors:**
Well-defined serving size, washout periods appropriate for crossover trials, any background diets to which the ingredient may have been added are described and measured. Washout periods are appropriate for crossover designed trials; other

Case 3:09-cv-01935-AJB-DHB Document 73-2 Filed 08/17/11 Page 6 of 9
Case 1:10-cv-00224-JS Doc #: 106-1 Filed: 06/24/11 6 of 9. PageID #: 2188

02/02/06     **Nutritional Science:**     6
**Plan of Principles**

possible concurrent changes in diet and health related behavior are identified and assessed.

8. **Data Analysis:**
Appropriate statistical analyses applied to the data, statistical significance interpreted appropriately. (NOTE: statistical significance is a p value of 0.05 or less)
9. **Peer Review:**
Evidence published in a peer-reviewed journal will have precedence over evidence that has not been subjected to peer review.

D. **Evidence Totality:**
In understanding the *totality of evidence* relating to a claim, there are multiple criteria to consider including the strength of the entire body of evidence, its quality and quantity, and its consistency. Furthermore, we will consider all available relevant research both positive and negative. If negative research is found, we will have to determine if there is a plausible explanation for the results. For example, we would look for different testing methods, different study populations, and the design of the study and the concentration of the ingredient(s). In considering the totality of evidence, the strength of the entire body of evidence is where we base our claims. For example, we may find several negative studies, but the positive studies may outnumber the negative. In addition we may find the negative studies to be poorly designed and hence when taken as a whole, the claims being made are supported. This would also hold true in the opposite scenario when the totality is negative and we find the potential claims to be inadequately supported.

VII. **Claim Types:**
Frequently we will have situations that may require different "levels" of substantiation for our products and their respective claims, depending on where the claims appear. For the purposes of this document, we will describe these claim types in more detail and give examples of the level of substantiation considered sufficient for each. They are claims made in the wheel, bulleted claims on the package and/or label, claims made in the name of the product as well as in advertisements.

A. **Wheel Claims:**
The wheel on our packages is found in two forms. The first is in the form of a wheel with "slices" of ingredients that correspond to the subject matter/claim area at the top of each slice. This type is found on the One-A-Day adult and children products. The second is in the form of a "boulder" and this type is found on the Flintstones products. The intention of both forms is to relay to the consumer reading the package what is known as general textbook knowledge about a nutritional ingredient. For example, a wheel slice for Bone Strength might contain Calcium, Magnesium, Zinc, and Vitamin D for which general textbook knowledge states that these ingredients are involved in bone strength. Under a slice titled "Immune Health" you might find ingredients such as Vitamin A, Vitamin C, Vitamin E, Zinc and Iron for which general textbook knowledge is available outlining their roles in immunity. There are some guidelines that apply to ingredients found in the wheel. First, the ingredient must present in 10% or more of the daily value or dose suggested by a clinical study for an ingredient found in the diet. Second, the general knowledge must be appropriate to the population group for which the product is intended. For example, if the use or benefit to which an ingredient is being paired only occurs in a deficient population, and our target population is not deficient in this ingredient according to CSFII and NHANES data, a wheel claim would not be applicable to this ingredient.

Case: 3:09-cv-01935-AJB-DHB Document 73-2 Filed 08/17/11 Page 7 of 9
Case: 1:10-cv-00224-JG Doc #: 106-1 Filed: 06/24/11 7 of 9. PageID #: 2189

02/02/06            **Nutritional Science:**           7
**Plan of Principles**

### B. Bulleted Claims:

Bulleted claims on a package include any claims made on the panels of the package other than in the name or in the wheel, and may be the same claims as found in the wheel, but expanded. When the function of the ingredient or grouping of ingredients is well documented, known in nutrition textbooks (general textbook knowledge), and present in the product in sufficient quantities, it can be moved from or used in both the wheel and bullet. If the function of the ingredient is not well documented in nutrition textbooks, clinical documentation supporting the claim will be required. An example of this would be EGCG from Green Tea and the claim "Enhance Metabolism". Lacking general textbook knowledge that EGCG enhances metabolism, clinical data was used as substantiation.

When a claim for an ingredient found in the wheel is based on general textbook knowledge showing a link through another ingredient or mechanism the following will be required for it to become a bullet claim. The link will be stated as part of the claim, or clinical data will be used as substantiation. An example of this is Vitamin C and healthy joints. Vitamin C is linked to healthy joints through the fact that Vitamin C is involved in the production of collagen and collagen is a component of joints. Putting Vitamin C under a wheel claim for joints is acceptable, however using Vitamin C for a bullet claim would require spelling out the link through collagen.

### C. Product Name Claims:

When a claim is stated or implied in the name of the product, adequate clinical data or textbook knowledge must be available for substantiation. For example, for the name Cholesterol Plus, the ingredient(s) in the product for cholesterol are required to have clinical data as substantiation. This could be in the form of at least one double-blind placebo controlled trial. In the absence of a double-blind, placebo-controlled trial, additional trials available may be considered by medical, regulatory and legal for their use in substantiation for a name claim. For example "BP" or "Blood Pressure", with folic acid as the ingredient, can be used as a bullet or wheel claim, but it was not used as a product name. In this case there is adequate evidence linking folic acid to a reduced risk of developing hypertension and hence we are comfortable with substantiation for a wheel or a bullet claim. However, double-blind placebo controlled data appropriate to our dose and target population is not available. As a result, "BP" in the name of the product was not used.

### VIII. Use of a Key Opinion Leader (KOL) for substantiation:

There are some cases in which we may wish to solicit the opinion of a KOL for dose, claims and insight substantiation as well as clinical data interpretation. A good example is in regards to the vast majority of data on Omega-3 related to cognitive development. The research has been primarily done with infants and pregnant women. However, there is general consensus in the scientific community of the merit of Omega-3 for healthy brain development in children. In this case, where we do not have a clinical study or general textbook knowledge available to determine the appropriate dose, we can seek outside assistance from a lead researcher in Omega-3 for an expert opinion expressly based on scientific facts. The opinion provided will be kept in our substantiation file.

Interpretation of subjective measurements may be an area where an outside opinion will help our substantiation. For example, in a study on stress where subjective measurements were used and the collective knowledge within our organization is not as familiar with these measurements and with the validity of the testing procedures, we can seek an outside expert

02/02/06            **Nutritional Science:**         8
**Plan of Principles**

opinion on the trial, its measurements and results. The opinion provided will be kept in our substantiation file.

Insight substantiation is another area where we may need to seek outside opinion. If we have a particular insight that has been found to resonate well with consumers and we are unsure if our substantiation specifically covers it, we can seek an outside opinion from an expert in the field in question. For example, if the data on bone density point to a specific age group, collaborating on the insight with a key researcher in the field of bone density can help to ensure our message is accurate.

### IX.    The 10% rule:

We have adopted this guideline which is believed to be a common industry standard. The "10% rule", as Bayer uses it, is based on FDA regulations for health claims which require a "good source" of an ingredient to be present to support claim. The idea is that you do not need to get 100% in one serving/dose since the ingredient is common to the diet and you eat three meals and 1 snack everyday (according to FDA Food Regulations). Therefore as long as an ingredient is found in the general/common diet, we can apply the following to make basic function claims:

- Use 10% of the Daily Value (DV), when there is a DV (ex: vitamin C supports immune function)
- Use 10% of the Dietary Reference Intakes (DRI), if there is no DV, but there is a DRI (ex: choline supports brain function)
- Use 10% of the average daily intake, if there is no DV or DRI (ex: l-carnitine promotes metabolism)
- Use 10% of the efficacious level based on a clinical study endpoint. (ex: EGCG enhances metabolism)

### X.    Drug Safety POV:

A point of view (POV) is solicited from the Drug Safety Department as required. Typically, a Drug Safety POV is not needed when the formula and any additional ingredients are vitamins and/or minerals used at levels less than the upper limit. This is primarily because the upper limits were defined and set by the Institute of Medicine (IOM) and developed with a large margin of safety. A drug Safety POV is needed when an ingredient does not have an established RDI (recommended daily intake).

When a Drug Safety POV is required, R&D Medical Affairs will provide the following information: the source of the ingredient(s), the exact dose or range of doses being considered for the final product, the complete formula listing all ingredients and the claims being made. Drug Safety will compile the safety literature. This should be incorporated into the Medical Affairs (Nutritional Science) file.

The Drug Safety POV is also the source for any recommended and required label warnings or known interaction risks. For example, OAD Cholesterol Plus was deemed to require a warning based on Policosanol and its possible synergistic effect with aspirin. That warning as suggested by Drug Safety appears on our label as follows: "Before using this product, consult a health professional if you are taking medication for anticoagulation (blood thinning), including daily aspirin."

### XI.    Updating frequency for claims:

02/02/06    **Nutritional Science:**    9
            **Plan of Principles**

As scientific knowledge evolves, we need to remain in a position to continually revisit the substantiation of our claims. Doing so will ensure that our understanding of the science is as up to date as possible.

To accomplish this in a systematic way, there are four basic activities ongoing. First the frequency for an overview of all bullet and wheel claims is set at once every twenty-four months. (NOTE: For timing purposes the most recent update was July 2005.) Second, any time a package is taken through the copy review process, we do a basic review of the claims on the package. Third, we update substantiation files and science understanding when we work on new products. Fourth, we continually monitor scientific developments for significant research on ingredients we use. It should be noted as well that a review of any particular claim and/or ingredient could be completed prior to the 2-year mark in the event of a new, significant or important, study that may contradict a current claim.

CONFIDENTIAL    BAYER-0125712